**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

DARO C. WEILBURG,

                                    Plaintiff,                      5:22-cv-435 (BKS/TWD)

v.

ETHAN C. KOSS,

                                    Defendant.

**Appearances:**

*Plaintiff pro se:*
Daro C. Weilburg
Cicero, New York 13039

*For Defendant:*
Letitia James
Attorney General of the State of New York
Rachael S. Ouimet
Assistant Attorney General, of Counsel
The Capitol
Albany, New York 12224-0341

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I.    INTRODUCTION**

Plaintiff pro se Daro C. Weilburg initiated this action under 42 U.S.C. § 1983 against

Defendant Ethan C. Koss and others, alleging that Plaintiff was falsely arrested for misdemeanor

criminal trespass in the second degree in violation of New York Penal Law section 140.15(1).

(Dkt. No. 1.) Following initial review of Plaintiff's complaint under 28 U.S.C. § 1915(e), (Dkt.

No. 6), the Court found that Plaintiff's false arrest claim against Defendant survived sua sponte

review. (Dkt. No. 13.) Presently before the Court is Defendant's motion for summary judgment

under Federal Rule of Civil Procedure 56. (Dkt. No. 63.) The motion is fully briefed. (Dkt. Nos. 66, 68.) For the following reasons, Defendant's motion for summary judgment is granted.

## II.     FACTS[1]

Plaintiff was the downstairs tenant in a building located at 4899 Bear Path Road, Stockbridge, New York, in which the owner of the building, Richard Castellane, separately resided. (Dkt. No. 63-2, ¶ 3; Dkt. No. 66, ¶ 3; *see also* Dkt. No. 63-4, ¶ 9; Dkt. No. 63-3, at 17–18.) Plaintiff testified that in exchange for providing certain maintenance services, Plaintiff did not pay rent or for utilities. (Dkt. No. 63-3, 17–18; Dkt. No. 66-1, ¶ 1). Plaintiff would "often have to go to [Castellane's] residence and turn off the water [Castellane] left on, or the stove [Castellane] left on, . . . take care of the cable and internet connections[,] . . . [and] from time to time get food and medicines for [Castellane's] dog." (Dkt. No. 66-1, ¶ 3; *see also* Dkt. No. 63-3, at 39–40, 44.) Plaintiff asserts that he and Castellane would enter into verbal contracts each year after the beginning of the year. (Dkt. No. 66-1, ¶ 2.)

Plaintiff claims that in "the late 2021, early 2022 months" he had a "falling out" with Castellane, and that they "avoid[ed] each other as much as humanly possible" but that Castellane never told Plaintiff that he could no longer enter Castellane's abode. (*Id.* ¶ 3.) Plaintiff states that he often went to Castellane's residence to "turn off the water he left on, or the stove he left on and take care of the cable and internet connections." (*Id.*)

On March 4, 2022, Plaintiff received a letter from an attorney on behalf of Castellane indicating that "Mr. Castellane wishe[d] to amicably conclude [their] relationship and accept[]

---

[1] The facts are drawn from Defendant's Statement Pursuant to Rule 56.1(a) and Plaintiff's Statement in Rebuttal, (Dkt. Nos. 63-2, 66), to the extent the facts are well-supported by pinpoint citations to the record, as well as Plaintiff's affidavit in support of his response, (Dkt. 66-1), and the exhibits attached to the parties' submissions and cited therein. In light of Plaintiff's pro se status, where Plaintiff denies facts set forth by Defendant without citing factual support from the record, the Court has undertaken an independent review of the record. The facts are construed in the light most favorable to Plaintiff as the non-moving party. *See Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

[Plaintiff's] offer to vacate the property located at 4899 Bear Path, Munnsville, New York, (Dkt. No. 66, at 10). Plaintiff states that he "rejected the offer" on March 7, 2022. (Dkt. No. 66-1, ¶ 4).

On March 11, 2022, Castellane fell and was transported to a hospital around midnight (Dkt. No. 66-1, ¶ 5; Dkt. No. 63-4, at 11.) Soon after, Plaintiff's internet service was not working, and Plaintiff entered Castellane's residence to reset the router. (Dkt. No. 63-2, ¶ 10; Dkt. No. 66, ¶ 10; Dkt. No. 66-1, ¶ 6; *see also* Dkt. No. 63-3, at 45–46, 48-49; Dkt. No. 63-4, ¶¶ 11–12.) Security-camera footage from Castellane's residence shows Plaintiff entering Castellane's residence multiple times between 11:52 p.m. on March 11, 2022, and 2:04 a.m. on March 12, 2022, and inspecting the router and security cameras. (Dkt. No. 63-4, Ex. C;[2] Dkt. No. 63-2, ¶ 14; Dkt. No. 66, ¶ 14; Dkt. No. 63-4, ¶ 14.)

On March 12, 2022, Defendant, a New York State Trooper, (Dkt. No. 63-4, ¶ 2), responded to a 911 call about a possible burglary at 4899 Bear Path Road. (*Id.* ¶ 9.) Norman Button, Castellane's friend, met Defendant on the property and explained that Robert Altman, another friend of Castellane's and the executor of Castellane's estate, called Button after seeing security-camera footage showing Plaintiff entering Castellane's residence. (*Id.*; *see also id.* at 11; *id.* Ex. B.[3]) While in Castellane's residence with Button, Defendant interviewed Altman on the phone. Altman stated that he checked the security cameras in the residence after Castellane was taken to the hospital and saw footage of Plaintiff inside Castellane's residence. (*Id.* ¶ 11; *id.* at 11; *id.* Ex. B.) Altman described what the security-camera footage showed and said he would email copies of the security-camera footage to Defendant. (*Id.* Ex. B.) Altman also informed

---

[2] Exhibit C is a set of multiple timestamped video files from Castellane's security cameras beginning at 11:47:20 p.m. on March 11, 2022, and ending at 2:14:28 a.m. on March 12, 2022. Both parties refer in their briefing to Exhibit C without reference to specific filenames or timestamps, and the Court adopts the same convention.

[3] Exhibit B is a set of multiple timestamped video files from Defendant's body camera on which Defendant recorded interviews relevant to his investigation. As with Exhibit C, the parties refer in their briefing to Exhibit B without reference to specific filenames or timestamps, and the Court adopts the same convention.

Defendant that Plaintiff did not have permission to enter Castellane's residence and that Castellane was trying to evict Plaintiff. (*Id.*)

Button informed Defendant that Plaintiff had been served a notice of eviction but was still residing in the downstairs apartment on the property. (*Id.*) Button and his wife, Diane, left the residence to pick Castellane up from the hospital. (*Id.*)

Defendant then interviewed Plaintiff in the downstairs apartment at 4899 Bear Path Road. (*Id.*) Plaintiff told Defendant that he entered Castellane's residence to reset the router, that he took the security cameras down to look at them before putting them back up, and that he had permission to enter Castellane's residence. (Dkt. No. 63-2, ¶ 10; Dkt. No. 66, ¶ 10; Dkt. No. 63-4, ¶ 12; Dkt. No. 63-4 at 11.) Plaintiff also said that he has the keys to Castellane's residence, that he feeds Castellane's dogs, and that he is the caretaker of the property. (Dkt. No. 63-4, Ex. B.) Plaintiff informed Defendant that Castellane was "trying to fire [Plaintiff] and trying to kick [Plaintiff] out of here" but "he can't" and that Altman "fired" Plaintiff. (*Id.*) Plaintiff told Defendant that he did not take anything from Castellane's residence. (*Id.*)

The same day, upon Castellane's return to his residence from the hospital, Defendant interviewed Castellane, along with Norman and Diane Button, in Castellane's residence. (*Id.*) During Defendant's interview of Castellane, Castellane said there was "no way" Plaintiff was supposed to be in Castellane's residence, and Castellane did not know how Plaintiff got the keys to Castellane's residence (*Id.*) Diane Button informed Defendant that Plaintiff "has been helping out" and "has been the caretaker for the past couple years, but they're in the process of doing an eviction, and he's been served paperwork, and he's been going back and forth with really caustic, nasty emails." (*Id.*) Castellane told Defendant that Plaintiff "for a long time had the right to come up but then there was a complete breakdown between the two us . . . so any entering after that

there was no permission." (*Id.*) Diane Button told Defendant that Plaintiff "never comes up when Richard is away" and that coming up in the middle of the night was "really sketchy." (*Id.*) Castellane stated that in the past, Plaintiff would knock before coming into Castellane's residence. (*Id.*) Diane Button stated that they could not lock the door to Castellane's residence in case Castellane was in need of emergency assistance.

Defendant asked Castellane whether he had told Plaintiff that Plaintiff did not have permission to enter Castellane's residence. (*Id.*) Castellane did not state that he told Plaintiff that Plaintiff no longer had permission to enter Castellane's residence but stated: "He knew there was [no permission]. He knew it"; "There was a breakup act and that break was the extreme anger that he knew I had for him . . . . We served him papers"; and "He knew that he couldn't come up here. He'd been forbidden to come up here." (*Id.*) Castellane stated multiple times that he wanted Plaintiff arrested. (*Id.*)

Diane Button informed Defendant that Plaintiff used to have control of the internet in his apartment but that Altman "switched it" to be controlled in Castellane's residence because Plaintiff was "doing stuff with it" that Altman "didn't like." (*Id.*) Diane Button also stated that "lately, [Plaintiff] has been coming up all weird times of day" and "before, [Plaintiff was] coming up during the day." (*Id.*) Castellane informed Defendant that Plaintiff is a Jehovah's Witness, and Defendant noted that someone had previously informed him of that fact. (*Id.*)

While Defendant was at Castellane's residence, another individual, Andrew Catello, who serviced Castellane's home-security system, arrived and provided Defendant with a flash-drive containing the security-camera footage that shows Plaintiff entering Castellane's residence multiple times between 11:52 p.m. on March 11, 2022, and 2:04 a.m. on March 12, 2022. (*Id.* ¶ 13; *id.* at 13; *see also id.* Exs. B, C.) Catello also told Defendant that Plaintiff's assertion that the

internet was not working "would be a lie" because "if there was no internet the cameras would go off." (*Id.* Ex. B.) Catello told Defendant that Plaintiff took the cameras down to take out the physical memory cards that the cameras formerly used to save footage but that the cameras were updated to store footage via the internet. (*Id.*) Defendant and Castellane prepared a sworn written statement in which Castellane asserted that Plaintiff—who Castellane refers to as a "former caretaker" with "a separate residence on [Castellane's] property"—"[did] not have permission to enter [Castellane's] residence" and stated his desire to pursue criminal charges against Plaintiff for entering Castellane's residence without permission. (*Id.* at 13, 17; Dkt. No. 63-2, ¶¶ 16–17; Dkt. No. 66, ¶¶ 16–17; Dkt. No. 63-4, ¶ 15.)[4] Castellane was not aware of any property missing from his residence but indicated that he would not be able to tell if there were. (Dkt. No. 63-4, at 13; *id.* Ex. B.)

Defendant concluded that his interviews of Plaintiff, Button, Altman, and Castellane, along with the security-camera footage of Plaintiff entering Castellane's residence and Castellane's sworn statement, provided probable cause to arrest Plaintiff. (Dkt. No. 63-4, ¶ 19.) Immediately after leaving Castellane's residence, Defendant walked to the downstairs apartment on the property to arrest Plaintiff. (Dkt. No. 63-4, Ex. B.) Plaintiff reiterated that he was the caretaker of the property and therefore "can't commit a crime" on the property. (*Id.*) Plaintiff also stated that he "had the keys" to Castellane's residence. (Dkt. No. 66-1, ¶ 8.) When Defendant stated that Castellane said Castellane never gave Plaintiff a key and that Castellane does not know how Plaintiff got the key, Plaintiff responded that "his lawyers have to ask for it

---

[4] After discussion with Castellane, Defendant typed a draft of Castellane's statement on a computer in Defendant's patrol car. (Dkt. No. 63-4, Ex. B.) Defendant then printed it out for Castellane's review. (*Id.*) Castellane made changes, and Defendant returned to his patrol car to edit and reprint the statement. (*Id.*) Defendant and Castellane repeated this process until Castellane approved the statement, at which point Castellane signed and initialed the statement. (*Id.*; *see also id.* at 17.)

back." (Dkt. No. 63-4, Ex. B.) Defendant arrested Plaintiff and charged him with Criminal

Trespass in the Second Degree under New York Penal Law section 140.15(1). (Dkt. No. 63-2,

¶ 19; Dkt. No. 66, ¶ 19; Dkt. No. 63-4, ¶ 19; *id.* at 13; *id.* Ex. B.) New York Penal Law section

140.15(1) provides that "[a] person is guilty of criminal trespass in the second degree when . . .

he or she knowingly enters or remains unlawfully in a dwelling."

Plaintiff received a "Notice of Termination" of his tenancy from an attorney for

Castellane on March 14, 2022, (Dkt. No. 66, at 11.) On April 7, 2022, Plaintiff received a

communication from a lawyer on behalf of Castellane directing Plaintiff to "immediately return

Mr. Castellane's property (the keys)" and informing Plaintiff that "no services are requested or

permitted and [he] must cease from performing any such functions," (Dkt. No. 66, at 9.) The

communication also informed Plaintiff that he "must vacate the property within 90 days." (*Id.*)

The parties dispute whether Plaintiff had permission to enter Castellane's residence on

the night of March 12, 2022. (Dkt. No. 63-4, ¶ 15; Dkt. No. 66, ¶ 3; Dkt. No. 66-1, ¶ 3.)

Castellane stated to Defendant that Plaintiff did not have permission to be in his residence and

that Plaintiff knew he did not have permission to be in Castellane's residence—though

Castellane did not tell Defendant that Castellane himself had told Plaintiff so. (Dkt. No. 63-4, at

17; *id.* Ex. B.) Plaintiff asserts he had permission to make repairs in Castellane's residence,

including fixing the internet, and that "at no time did Mr. Castellane EVER tell [Plaintiff] that

[he] could no longer enter [Castellane's] abode." (Dkt. No. 66-1, ¶ 3; *see also* Dkt. 63-3, at 72;

Dkt. No. 63-4, at 11.) Plaintiff also asserts that Castellane never told Defendant that Castellane

informed Plaintiff that Plaintiff was no longer allowed to enter Castellane's residence. (Dkt. No.

63-3, at 73; Dkt. No. 66-1, ¶ 9.)

Plaintiff testified that it is his position that Defendant arrested him based on his religion. (Dkt. No. 63-3, at 75–76). Plaintiff asserts that Defendant was told that Altman disconnected the internet access because Altman did not like the videos Plaintiff was making on the Jehovah's Witness YouTube channel, and that Defendant did not defend Plaintiff's First Amendment right to freedom of religion. (Dkt. No. 66-1, ¶ 10; Dkt. No. 63-3 at 75-76). Although Defendant was informed during his witness interviews that Plaintiff is a Jehovah's Witness, (Dkt. No. 63-4, Ex. B), Defendant stated that Plaintiff's religious beliefs had no bearing on his decision to arrest Plaintiff. (*Id.* ¶ 5.)

Plaintiff asserts that multiple witnesses informed Defendant that Plaintiff was the caretaker and that Defendant knew this, (Dkt. No. 66-1, ¶¶ 8, 10, 12), that "there is evidence contained in the bodycam footage that could lead one to suspect that Richard Castellane was not in full capacity of his faculties," (*id.* ¶ 9), and that "the entire fiasco was a set-up," (*id.* ¶ 11).

## III.   LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, the entry of summary judgment is warranted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. "A 'material' fact is one capable of influencing the case's outcome under governing substantive law, and a 'genuine' dispute is one as to which the evidence would permit a reasonable juror to find for the party opposing the motion." *Figueroa v. Mazza*, 825 F.3d 89, 98 (2d Cir. 2016) (citing *Anderson*, 477 U.S. at 248).

"If the moving party carries its burden, the nonmoving party must come forward with evidence that would be sufficient to support a jury verdict in its favor." *McKinney v. City of*

*Middletown*, 49 F.4th 730, 738 (2d Cir. 2022) (internal quotation marks omitted). Rather than

"deny[ing] the moving party's allegations in a general way, the party opposing summary

judgment must present competent evidence that creates a genuine issue of material fact." *Id*.

(citation omitted). "When ruling on a summary judgment motion, the district court must construe

the facts in the light most favorable to the non-moving party and must resolve all ambiguities and

draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp*., 352

F.3d 775, 780 (2d Cir. 2003). "Assessments of credibility and choices between conflicting

versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys

v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).

A court must read the submissions of a pro se plaintiff liberally and interpret them "to

raise the strongest arguments that they suggest." *McPherson v. Coombe*, 174 F.3d 276, 280 (2d

Cir. 1999) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)). However, a pro se

party's "'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a

motion for summary judgment." *Jordan v. New York*, 773 F. Supp. 2d 255, 268 (N.D.N.Y. 2010)

(citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)); *see also Wagner v. Swarts*, 827 F.

Supp. 2d 85, 92 (N.D.N.Y. 2011).

## IV.   DISCUSSION

### A.   Probable Cause

Defendant argues that Plaintiff's false arrest claim should be dismissed because there was

probable cause to arrest him. (Dkt. No. 63-1 at 8–11). Specifically, Plaintiff argues that he was

lawfully allowed to be in Castellane's residence, that Defendant relied on a false sworn statement

that he fabricated with Castellane and that the arrest was based on Plaintiff's religion or a

relationship between Defendant and Castellane or a witness. (Dkt. No. 66, ¶¶ 7, 10, 18, 22–26.)

False arrest claims under § 1983 are analyzed under the law of the state in which the arrest occurred. *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006). The elements of a false arrest claim in New York are: "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012). "The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)).

An officer has probable cause when they have "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Jaegly*, 439 F.3d at 152. To determine the existence of probable cause, a court "must consider those facts *available to the officer* at the time of the arrest and immediately before it." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006 (quoting *Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002)). The court should look to "the totality of the circumstances" and "must be aware that probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Id.* (quoting *Caldarola*, 298 F.3d at 162). "[P]olice officers, when making probable cause determinations, are entitled to rely on the victims' allegations that a crime has been committed," *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) (quoting *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995)), if the circumstances do not "raise doubt as to the person's veracity," *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014) (quoting *Panetta*, 460 F.3d at 395).

Here, the record shows that Defendant's decision to arrest Plaintiff was based on the following information: Defendant conducted interviews with Plaintiff, Castellane, Button, and Altman. (Dkt. No. 63-4, ¶¶ 9–10; *id.* at 11–13; *id.* Ex. B.) Button, Altman, and Plaintiff all confirmed that Plaintiff had been inside Castellane's residence the night of March 11. (*Id.* ¶¶ 9, 11–12; *id.* at 11.) Defendant also reviewed security-camera footage showing Plaintiff entering Castellane's residence multiple times between 11:52 p.m. on March 11, 2022, and 2:04 a.m. on March 12, 2022. (*Id.* ¶ 14; *id.* Ex. C.) Plaintiff admits that he did so. (Dkt. No. 63-2, ¶ 14; Dkt. No. 66, ¶ 14.) Castellane stated that Plaintiff did not have permission to enter his residence and provided a sworn statement to that effect. (Dkt. No. 63-4, ¶¶ 15–17; *id.* at 13, 17; *see also id.* Ex. B.) Castellane also told Defendant that Plaintiff knew Plaintiff did not have permission to enter Castellane's residence. (*Id.* Ex. B.) Norman Button told Defendant that Plaintiff had been served with eviction paperwork. (*Id.*) Castellane told Defendant that while Plaintiff "had the right to come up" "for a long time," after "the complete breakdown between the two of us" "there was no permission." (*Id.*) Plaintiff himself told Defendant that Altman fired Plaintiff and that Castellane was trying to kick him out. (*Id.*)

This evidence provided Defendant with reasonably trustworthy information that Plaintiff had committed criminal trespass in the second degree, and therefore, Defendant had probable cause to arrest Plaintiff for that crime. *See Jaegly*, 439 F.3d at 152–53; *Panetta*, 460 F.3d at 395–99; *see also Singer*, 63 F.3d at 119 ("An arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity."); *Morris v. Johnson*, No. 17-cv-371, 2020 WL 4365606, at *5, 2020 U.S. Dist. LEXIS 135092, at *11–13 (N.D.N.Y. July 30, 2020) (finding that corroborated eyewitness

testimony is sufficient to establish probable cause). Plaintiff asserts that he did not know he did not have permission to enter Castellane's residence, citing, inter alia, the documents he received after his arrest from an attorney for Castellane. But a court's probable cause analysis is limited to "those facts *available to the officer* at the time of the arrest and immediately before it." *Panetta*, 460 F.3d at 395). And Defendant had probable cause based on the corroborated witness interviews, the security-camera footage, and Castellane's interview and sworn statement: Defendant "was not required to explore and eliminate every plausible claim of innocence before making an arrest" even where, as here, Plaintiff "claimed that he had a valid explanation for his actions." *See Jaegly*, 439 F.3d at 153.

Plaintiff's argument that multiple witnesses informed Defendant that Plaintiff was the caretaker, (Dkt. No. 66-1, ¶¶ 8, 10, 12), and that Plaintiff told Defendant he had keys to Castellane's residence, (*id.* ¶ 8), is similarly unavailing. The witnesses discussed Plaintiff's *past* status as caretaker, (Dkt. No. 63-4, Ex. B.) And having worked at some point as a caretaker, Plaintiff's possession of the keys does not raise doubt as to the veracity of Castellane's statement that Plaintiff no longer had permission to enter Castellane's residence, especially in light of multiple witnesses' discussion of the actions being undertaken to evict Plaintiff and Plaintiff's own admission to Defendant that Plaintiff was fired by Altman.

Furthermore, construing the record in favor of Plaintiff and drawing all reasonable inferences in his favor, Plaintiff has not cited any fact that would raise doubt as to the veracity or capacity of Castellane or any other witness. Plaintiff has not cited evidence from which Defendant should have suspected that Castellane "was not in full capacity of his faculties." (Dkt.

No. 66-1, ¶ 9.)[5] Nor has Plaintiff cited evidence to support his contentions—which are undermined by Defendant's sworn declaration—that Defendant acted out of religious animus or any relationship he had with a witness, or that Defendant knowingly relied on false or fabricated information. Rather, the record evidence shows that Defendant discussed the circumstances surrounding the incident with Castellane at length and worked with Castellane to prepare a sworn statement—which Defendant edited multiple times at Castellane's instruction—that Castellane signed under penalty of perjury. (Dkt. No. 63-4, Ex. B.) Plaintiff's argument that "the entire fiasco was a set-up" involving Castellane, Altman, "and cohorts" is simply an assertion unsupported by facts available to the Defendant prior to his arrest—or even any facts in this record.

Thus, because Defendant had probable cause to arrest Plaintiff and because probable cause is a complete defense to false arrest, Defendant's motion for summary judgment as to Plaintiff's false arrest claim is granted.

## B.    Qualified Immunity

Defendant argues that even if there is not probable cause, summary judgment in his favor is still proper because he is entitled qualified immunity. Plaintiff disagrees. (Dkt. No. 66, at 7–8.)

"Qualified immunity protects public officials from liability for civil damages when one of two conditions is satisfied: (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015) (quoting *Russo v. City of Bridgeport*, 479

---

[5] While Plaintiff points to the fact that Castellane initially asked for Plaintiff's wife to be arrested, when Castellane was informed that Plaintiff's wife was not involved, Castellane accepted that fact. (Dkt. No. 63-4, Ex. B.)

F.3d 196, 211 (2d Cir. 2007)). Defendants have the burden of establishing qualified immunity. *Vincent v. Yelich*, 718 F.3d 157, 166 (2d Cir. 2013).

In the context of a § 1983 claim for false arrest, "an arresting officer is entitled to qualified immunity so long as arguable probable cause was present when the arrest was made." *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016) (quoting *Zalaski v. City of Hartford*, 723 F.3d 382, 390 (2d Cir. 2013). Arguable probable cause exists if "(a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Triolo v. Nassau County*, 24 F.4th 98, 107 (2d Cir. 2022) (quoting *Figueroa,* 825 F.3d at 100). "In deciding whether an officer's conduct was objectively reasonable[,] . . . we look to the information possessed by the officer at the time of the arrest, but we do not consider the subjective intent, motives, or beliefs of the officer." *Garcia*, 779 F.3d at 92 (quoting *Amore v. Novarro*, 624 F.3d 522, 536 (2d Cir 2010)).

Here, as discussed above, viewing the evidence in the light most favorable to Plaintiff,[6] Defendant had sufficient information to establish probable cause to arrest Plaintiff on March 12, 2022—namely, multiple corroborated witness statements, including Plaintiff's, and security-camera footage confirming that Plaintiff entered Castellane's residence several times between 11:52 p.m. on March 11, 2022, and 2:04 a.m. on March 12, 2022, as well as Castellane's interview and sworn statement. (Dkt. No. 63-2, ¶ 14; Dkt. No. 66, ¶ 14; Dkt. No. 63-4, ¶¶ 9–12, 14–17; *id.* at 11–13, 17; *id.* Exs. B, C.) Based on this information, it was objectively reasonable

---

[6] For purposes of the qualified immunity analysis, only the facts known to Defendant at the time of Plaintiff's arrest are relevant. *See Gonzalez*, 728 F.3d at 155 ("The inquiry is limited to 'whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest.'" (quoting *Jaegly*, 439 F.3d at 153)). Therefore, while the Court accepts Plaintiff's version of the facts insofar as it is supported by record evidence and views all of the facts in the light most favorable to the Plaintiff, the Court only considers those circumstances that were knowable to Defendant at the time of Plaintiff's arrest. *See White v. Pauly*, 580 U.S. 73, 76–77 (2017) ("Because this case concerns the defense of qualified immunity, . . . the Court considers only the facts that were knowable to the defendant officers.")

for Defendant to believe there was probable cause to arrest Plaintiff. Therefore, Defendant is entitled to qualified immunity.

## V.      CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendant's motion for summary judgment, (Dkt. No. 63), is **GRANTED**; and it is further

**ORDERED** that the complaint, (Dkt. No. 1), is **DISMISSED**; and it is further

**ORDERED** that the Clerk serve a copy of this Order upon the parties in accordance with the Local Rules and close this case.

**IT IS SO ORDERED.**

Dated: July 17, 2024
       Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge